## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CHARLES ARMSTRONG** | * | |
| **6801 Buck Rd. #251** | | |
| **Fort Washington, Maryland 20784,** | * | |
| | | |
| **VERONICA ARMSTRONG** | * | |
| **6801 Buck Rd. #251** | | |
| **Fort Washington, Maryland 20784,** | * | **Case No.: 1:15-cv-2529** |
| | | |
| **SÉKOU FRASER** | * | |
| **5033 Sheriff Rd. NE** | | |
| **Washington, DC 20019,** | * | |
| | | |
| **MARY WATERS** | * | |
| **755 S. Potomac St.** | | |
| **Hagerstown, Maryland 21740,** | * | |
| | | |
| **FRANKLIN WATERS** | * | |
| **755 S. Potomac St.** | | |
| **Hagerstown, Maryland 21740,** | * | |
| | | |
| **RICHARD R. WINGFIELD, JR.** | * | |
| **14009 Bramble Lane, Apt. T3** | | |
| **Laurel, Maryland 20708,** | * | |
| | | |
| **and** | * | |
| | | |
| **ARNETTA R. WINGFIELD** | * | |
| **14009 Bramble Lane, Apt. T3** | | |
| **Laurel, Maryland 20708,** | * | |
| | | |
| *Plaintiffs* | * | |
| **v.** | | |
| | * | |
| **MONARCH BANK t/a** | | |
| **MONARCH MORTGAGE t/a** | * | |
| **FITZGERALD FINANCIAL GROUP** | | |
| **1435 Crossways Blvd.** | * | |
| **Chesapeake, VA 223320** | | |
| | * | |
| **Serve on:** | | |
| | * | |
| **THE CORPORATION TRUST** | | |
| **INCORPORATED** | * | |

Resident Agent
**351 West Camden Street**                    *
**Baltimore, MD 21201,**
                                              *
   *Defendant.*
                                              *

  *    *    *    *    *    *    *    *    *    *    *    *    *

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Sèkou Fraser, Charles and Veronica Armstrong, Mary and Franklin Waters, and Richard and Arnetta Wingfield, file this Complaint and Demand for Jury Trial against Defendant Monarch Bank ("Monarch") through their counsel, E. David Hoskins and Max F. Brauer of The Law Offices of E. David Hoskins, LLC and for cause state:

## PRELIMINARY STATEMENT

1.    This case involves violations of numerous federal and state mortgage lending statutes and common law. Defendant Monarch Bank violated these statutes and common law by failing to provide required statutory disclosures, and misrepresenting to Plaintiffs that it was processing their loan applications through the approval and underwriting process when it was not. This conduct caused Plaintiffs to enter into contracts to purchase homes. By the time Plaintiffs discovered the fraud, they were forced to abandon their purchases or delay closing, and, for one Plaintiff, experience temporary homelessness.

2.    Mortgage lending is a long and heavily regulated process. A consumer looking to purchase a home initially must find a lender and submit an

application.

3.     In particular, a formal application triggers requirements that the lender provide the consumer with a Good Faith Estimate and disclosures pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.* within three business days of receiving a completed application. 15 U.S.C. § 1638(b); 12 C.F.R. § 1026.19(a). A completed application includes the borrower's name, income, social security number, property address and estimate of the value of the property and the mortgage amount sought. 12 C.F.R. § 1026.2(a)(3)(ii). Failure to provide these disclosures gives the consumer a cause of action under TILA.

4.     In vetting these applications, lenders in part turn to consumer reports, triggering further regulation under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* Additional requirements are found in the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.* (which also requires Good Faith Estimates and also a settlement statement at closing) and Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, *et seq.* among others.

5.     If a lender does not choose to extend credit to a consumer, the lender must send the consumer an adverse action notice pursuant to ECOA, and, if the decision is based on a consumer report, FCRA.

6.     State law provides further regulation against misrepresentations and unfair and deceptive trade practices. In particular, the Maryland Consumer Protection Act and District of Columbia Consumer Protection Act prohibit unfair or deceptive trade practices in mortgage lending. Md. Code, Comm. L. § 13-303;

D.C. Code § 28-3901, *et seq.* In addition, the Maryland Mortgage Fraud Act prohibits mortgage fraud, which includes knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process or creating or producing a document for use during the mortgage process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission with the intent that the statement be relied on by the consumer. Md. Code, Comm. L. §§ 7-402; 7-401(1)-(2).

## IDENTIFICATION OF PARTIES

7.     Plaintiffs Charles and Veronica Armstrong ("Mr. and Mrs. Armstrong" or the "Armstrongs") are Maryland residents who at all times relevant to this complaint attempted to purchase real property in Maryland with a loan from Defendant Monarch for use as their primary residence. Mr. and Mrs. Armstrong are thus consumers.

8.     Plaintiff Sèkou Fraser ("Fraser") is a District of Columbia resident who at all times relevant to this complaint attempted to purchase real property in the District of Columbia with a loan from Defendant Monarch for use as his primary residence. Mr. Fraser is thus a consumer.

9.     Plaintiffs Mary and Frank Waters ("Mr. and Mrs. Waters" or the "Waters") are Maryland residents who at all times relevant to this complaint attempted to purchase real property in the District of Columbia with a loan from Defendant Monarch for use as their primary residence. Mr. and Mrs. Waters are

thus consumers.

10.     Plaintiffs Richard and Arnetta Wingfield ("Mr. and Mrs. Wingfield" or the "Wingfields") are Maryland residents who at all times relevant to this complaint attempted to purchase real property in Maryland for use as their primary residence from Defendant Monarch. Mr. and Mrs. Wingfield are thus consumers.

11.     Defendant Monarch Bank is a foreign corporation with its principal office located in Chesapeake, Virginia. Defendant Monarch is registered to do business in Maryland, maintains several offices in Maryland, and regularly conducts business in Maryland.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

13.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because both Defendants regularly conduct business throughout this district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims took place within this judicial district.

## STATEMENT OF FACTS

### a.     Allegations with Respect to all Plaintiffs.

15.     Plaintiffs' claims against Defendant arise out of the misrepresentations, acts and omissions of one of Defendants' employees, Erika Gillian Zabell ("Zabell"), who was at all times acting as Defendant's agent in the scope of her employment as a Senior Loan Officer and Senior Mortgage Banker.

16.     Plaintiffs all applied or began to apply for loans to purchase homes with Apex Home Loans, Inc. ("Apex") working through Zabell in her capacity as a Senior Loan Officer and Senior Mortgage Banker. Each Plaintiff sought credit to purchase a primary residence. At the time Plaintiffs began working with Apex, Zabell had over a decade of experience in mortgage banking.

17.     Plaintiffs were referred to Apex and Zabell by their real estate agent Tony Taylor ("Taylor"). Taylor referred to Zabell as his "preferred lender" for his clients, including Plaintiffs, when working as a buyer's agent.

18.     While at Apex, Zabell failed to process loan applications through the approval and underwriting process all while making numerous misrepresentations that she was working on consumers' files, when in fact she was not.

19.     Apex subsequently fired Zabell sometime after August 24, 2014.

20.     However, Apex did not notify any of the Plaintiffs of the reason why Zabell's employment was terminated.

6

21.     Almost immediately after Apex fired Zabell, she was hired by Defendant Monarch.

22.     Defendant Monarch hired Zabell no later August 29, 2014 — five short days after she was fired by Apex.

23.     On information and belief, Defendant Monarch failed to make a reasonable inquiry to Apex to determine why Zabell just left her previous position.

24.     Zabell's position with Defendant Monarch was the same as it was with Apex — Senior Loan Officer and Senior Mortgage Banker.

25.     Zabell performed work in her capacity as Senior Loan Officer and Senior Mortgage Banker from Defendant Monarch's Rockville, Maryland office.

26.     Defendant Monarch listed Zabell on their website as Senior Loan Officer and touted her skills and credentials:

> Erika Zabell has over a decade of experience in mortgage banking in the Washington, D.C. area, specializing in FHA, VA and Conventional loans. She works with a full range of clients from first-time homebuyers to investors. Erika attributes her success to her excellent customer service skills and always putting her clients' financing needs first. By offering a diverse group of funding sources, Erika tailors mortgage solutions to best fit her clients' profiles and long-term financial objectives. Erika believes that lending is no longer a "one size fits all" industry. Her detailed approach helps her clients select the best products for their situation, which can provide them with substantial savings throughout the life of the loan.

> Purchasing a home or refinancing your existing home can be both exciting and somewhat stressful. Erika's knowledge of the mortgage process allows her to guide her clients through a smooth lending experience from start to finish.

27.   The Monarch website also listed her office phone and fax numbers, cell phone and company email address.

28.   Zabell then immediately brought her existing business clients, including Plaintiffs, to Defendant Monarch.

29.   Plaintiffs, believing that Zabell simply switched employers, began to work with Defendant Monarch through Zabell in her capacity as a Senior Loan Officer and Senior Mortgage Banker with Defendant Monarch.

30.   All of Plaintiffs' communications with Defendant Monarch then came chiefly through Zabell's email account with Defendant Monarch, which identified her as a Senior Loan Officer and Senior Mortgage Banker.

31.   Defendant Monarch, through Zabell, then began working with Plaintiffs to finance the purchase of their new homes.

32.   Defendant Monarch, through Zabell, failed to provide Plaintiffs with the required Good Faith Estimates and Truth in Lending disclosures as required by TILA.

33.   Defendant Monarch, through Zabell, failed to process loan applications through the approval and underwriting process all the while making numerous misrepresentations, explained in greater detail herein with respect to each Plaintiff, including falsified "preapproval," "closing cost worksheet," and "mortgage loan approval" documents and also claiming that appraisals occurred when they in fact had not. Defendant Monarch did none of this work that it

claimed to have done.

34.    Defendant Monarch, through Zabell, also misrepresented to Plaintiffs (explained in greater detail herein) that it was working through underwriting and with numerous third parties in the home buying process in order to qualify Plaintiffs for loans. In fact, Defendant Monarch did none of this work.

35.    Defendant Monarch, through Zabell, knowingly made these false and misleading representations to deceive Plaintiffs into thinking Defendant Monarch was working on their files, when in fact Defendant Monarch was not.

36.    Plaintiffs all relied on the misrepresentations made by Defendant Monarch and continued through the home buying process under the impression that Defendant Monarch was working towards lending money for closing.

37.    Plaintiffs relied on the misrepresentations made by Defendant Monarch to enter into ratified contracts to purchase homes, make earnest money deposits, and schedule closings.

38.    As a result of the acts and practices of Defendant Monarch, Plaintiffs were forced to delay or cancel the home buying process and suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress.

**b.    Allegations with Respect to Charles and Veronica Armstrong.**

39.    Plaintiffs Charles and Veronica Armstrong were referred to Apex and

Zabell by Taylor on or about July 31, 2014. Taylor followed up with the referral on or about August 4, 2014.

40.    On or about August 5, 2014, Apex, through Zabell, emailed Mr. and Mrs. Armstrong, reaching out to find a time to talk.

41.    On or about August 6, 2014, Apex, through Zabell, began taking an application from Mr. and Mrs. Armstrong for a VA Loan.

42.    On or about August 11, 2014, Apex, through Zabell, emailed Taylor to let him know that she was working on Mrs. Armstrong's credit, and that Mrs. Armstrong was currently right below 600. In fact, Apex, through Zabell was not working on Mrs. Armstrong's credit.

43.    On or about August 24, 2014, Taylor informed Apex, through Zabell, that the Armstrongs had "found the perfect property" and asked about financing options and for an approval letter. Zabell responded that same day that Mrs. Armstrong's "credit rescore" was not back yet. However, Apex, through Zabell, was not working on Mrs. Armstrong's credit.

44.    Sometime after August 24, 2014, Zabell was terminated by Apex for failing in her duties to process loan applications through the approval and underwriting process. Apex did not notify the Armstrongs or Taylor about Zabell's failures.

45.    Days later, after Zabell was hired by Defendant Monarch, Defendant Monarch issued a "Mortgage Loan Preapproval" to Mr. and Mrs. Armstrong

through Zabell, on or about August 29, 2014. The loan amount was $490,000 for a 30 year fixed loan. The conditions for the pre approval were "ratified contract, clear title, proof of homeowner's insurance, final underwriting, satisfactory appraisal."

46.     On or about that same day, Defendant Monarch issued another "Mortgage Loan Preapproval" to Mr. and Mrs. Armstrong through Zabell. The only difference between this document and the previous one is that this document was for a $500,000 loan and stated that "[A]ll Income and asset documentation has been collected and reviewed. Loan Has Been Run through Automated Underwriting." This document was used for the Armstrongs to make an offer on 11103 Riverview Road, Fort Washington, Maryland, 20744.

47.     Defendant Monarch issued a third "Mortgage Loan Preapproval" through Zabell on or about that same day. This loan was for $490,000 and also stated that "All income and asset documentation has been collected and reviewed. Loan has been run through automated underwriting." This pre approval letter was later submitted as part of the Armstrong's offer on 14821 Rolling Meadows, Upper Marlboro, MD 20772.

48.     Defendant Monarch, through Zabell, based these three "Mortgage Loan Preapproval" documents on the completed application information the Armstrongs previously provided to Zabell (name(s), income, social security number(s), an estimate of the value of the property sought, and the mortgage

amount sought). However, at no time did Defendant Monarch provide the Armstrongs with their good faith estimate and Truth in Lending Act Disclosures as required by 15 U.S.C. §§ 1638(a) & (b) and 12 C.F.R. § 1026.19(a).

49.     In addition, all three "Mortgage Loan Preapproval" documents were entirely fake and Defendant Monarch did nothing to "prequalify" Mr. and Mrs. Armstrong for a mortgage.

50.     However, Mr. and Mrs. Armstrong, believing that Defendant Monarch was working with them and that these "Mortgage Loan Preapproval" documents were real, relied on these fake documents to make offers on homes.

51.     On or about August 30, 2014, Zabell sent Taylor a PDF file "armstrong.pdf" to falsely misrepresent that Defendant Monarch was working on their loan.

52.     On or about September 12, 2014, the Armstrongs paid an earnest money deposit of $1,000 in reliance on the misrepresentations made by Defendant Monarch, through Zabell.

53.     On or about September 13, 2014, Defendant Monarch, through Zabell sent Mrs. Armstrong and Taylor a list of paperwork she needed to get started including 2012-2013 tax returns, pay stubs and awards letter, the Armstrong's last 2 months of all bank, investment and retirement statements, and copies of their drivers licenses.

54.     The Armstrongs mailed their documents to Defendant Monarch via

Zabell, but never heard from Defendant Monarch or Zabell about the documents being processed.

55.    On or about September 15, 2014 the Armstrong's offer to purchase 14821 Rolling Meadows Road, Upper Marlboro, Maryland 20772 was accepted.

56.    That same day, Taylor submitted the Armstrong's ratified contract to Defendant Monarch through Zabell for the full loan to be processed and underwritten.

57.    Defendant Monarch, through Zabell then notified the Armstrongs, Taylor, and the seller's agent that she was working with the underwriter to get an escrow approved for a septic repair. In fact, Defendant Monarch was not performing this work.

58.    Later, Defendant Monarch noted that they wanted a commitment from Prince George's County regarding septic system work. On October 2, 2014, the seller's agent emailed a statement to Defendant Monarch, through Zabell from the septic system contractor to see if the underwriter would accept it. Defendant Monarch, through Zabell, emailed Taylor and the seller's agent approximately 20 minutes later that day that she "will put this in front of underwriter now." However, Defendant Monarch did nothing.

59.    Taylor sent Defendant Monarch, through Zabell, a septic evaluation on or about October 3, 2014.

60.    On or about October 8, 2014 it was discovered that Defendant

Monarch, through Zabell, never qualified or prequalified the Armstrongs or did anything to process their applications, failing in their duties to take loan applications and process them through the pre approval and underwriting process. Defendant Monarch never processed any loan documents or performed any work on the Armstrongs' file despite making numerous knowing, intentional misrepresentations to the contrary.

61.     Defendant Monarch took adverse action against Mr. and Mrs. Armstrong by not lending to them after receiving their credit application through Zabell. However, Defendant Monarch failed to provide the Armstrongs with notice of this adverse action under 15 U.S.C. § 1691(d).

62.     The Armstrongs were not able to purchase 14821 Rolling Meadows Road until February 4, 2015 for $490,000.

63.     As a result of Defendant Monarch's acts and practices, the Armstrongs suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress.

**c.     Allegations with Respect to Sekou Fraser.**

64.     Sekou Fraser is a first time home buyer.

65.     Sekou Fraser began working with Erika Zabell while she was employed by Apex.

66.     Apex, through Zabell, worked with Mr. Fraser's real estate agent,

Tony Taylor, regarding financing options. Taylor put Mr. Fraser in touch with Zabell on or about August 6, 2014.

67.     On or about August 11, 2014, Zabell emailed Mr. Fraser a link to fill out information for a loan application for pre qualification with Apex. The email came from her email address with Apex, ezabell@apexhomeloans.com. Mr. Fraser immediately filled out the loan application, he received an email from Erika Zabell stating "Thank you for your application." However, at this point Mr. Fraser had not identified the property he wanted to buy, so this application was not entirely a formal application that would trigger the Good Faith Estimate and disclosure requirements under TILA.

68.     Zabell misrepresented to Fraser and Taylor that she began working on Mr. Fraser's application almost immediately. On August 11, she emailed Taylor stating that she hoped to have pre qualification the next morning.

69.     From August 12 through August 24, Apex, through Zabell, and Mr. Fraser, through Taylor, communicated regarding a loan for the purchase of 5033 Sheriff Road NE, Washington, DC 20019. 5033 Sheriff Road, NE was a two unit townhouse, and Mr. Fraser planned to live in one of the units as his primary residence and continue renting out the upstairs unit, which currently had a tenant. The communications included loan options given that rental income might exist and also Mr. Fraser's use of potential assistance from DC Open Doors and Home Purchase Assistance Program (HPAP). DC Open Doors is a program through the DC Housing Finance Agency designed to assist homebuyers such as

Mr. Fraser through downpayment assistance. HPAP provides interest-free loans and closing cost assistance.

70.    During the period between August 12 and August 24, Taylor and Zabell corresponded about different scenarios through DC Open Doors or HPAP, the amount of closing help to ask for, the current amount of the rental of the other unit and various mortgage amounts sought.

71.    Zabell's communications to Taylor included, "I am working on that now" with respect to taking an application and determining pre qualification for this property and using these programs.   In addition, on or about August 24, 2014, Zabell responded, "Let me work up both scenarios and lets review them and see." In fact, neither Apex nor Zabell was actually performing any work on Mr. Fraser's file.

72.    On August 19, 2014, Taylor emailed Apex, through Zabell, documents necessary for loan approval for Mr. Fraser including but not limited to his last two months of bank statements, his two most recent paystubs, his 2013 Tax Return and his 2012 Tax Return.

73.    Sekou Fraser received purchase pre-approval from Apex, through Zabell, on August 25, 2014 up to $210,000 for a conventional loan based on a credit score of 765. However, this document was fake and Apex had done no work to "preapprove" Mr. Fraser.

74.    Mr. Fraser relied on this purchase pre approval from Apex to submit

an offer for 5033-5039 Sheriff Road NE on or about August 25, 2014. This offer included Apex as the lender with Zabell's contact information listed. According to this offer, Mr. Fraser was to have a 30 year fixed FHA loan from Apex arranged by Zabell for $210,000 at 4.25 percent.

75.    On or about August 28, 2014, the contract was accepted for Mr. Fraser's new home. Taylor emailed the ratified contract to Apex, through Zabell, in addition to the title company and the seller's real estate agent.

76.    That same day, Mr. Fraser provided an earnest money deposit of $1,000.

77.    On or about August 29, 2014, Zabell emailed Mr. Fraser to schedule an in person meeting. The meeting was rescheduled by Zabell because she wanted to make sure that she had Mr. Fraser's documents in her possession from DC Open Doors. This statement was false because no work had been performed with DC Open Doors.

78.    On or about Thursday, September 4, 2014, Apex emailed Mr. Fraser's title company explaining that Erika Zabell was no longer employed by Apex, that Taylor had advised his clients to seek financing elsewhere, and that Apex was not handling the loan.

79.    Apex failed to inform Taylor or Fraser that in fact Zabell had been fired for failing in her duties to take loan applications and process them through the pre approval and underwriting process while making false statements to prospective home buyers that she was performing work on these files.

80.    Mr. Fraser then began receiving emails from Zabell's email address with Defendant Monarch, ezabell@monarchmtg.com, on or about September 5, 2014.

81.    In her capacity as a Senior Loan Officer and Senior mortgage banker with Defendant Monarch, Zabell continued to work on a loan for Mr. Fraser on behalf of Defendant Monarch. However, at no time did Defendant Monarch provide Mr. Fraser with his good faith estimate and Truth in Lending Act Disclosures as required by 15 U.S.C. §§ 1638(a) & (b) and 12 C.F.R. § 1026.19(a).

82.    Defendant Monarch, through Zabell wrote in an email sent the morning of September 5, 2014 that DC Open Doors would not have the correct paperwork until Monday, but that Mr. Fraser was getting an additional $1,000 for all the time it has taken them. These statements were all false.

83.    Approximately five minutes after sending the above email to Mr. Fraser, Zabell also sent Taylor an email stating that she had to go to the DC Open Doors Office at 3 pm because they sent incorrect documents for Mr. Fraser.

84.    The home inspection was also scheduled for September 5, 2014. Zabell stated to both Mr. Fraser and Taylor that she would be attending the home inspection.

85.    On or about September 8, 2014, Defendant Monarch, through Zabell, stated in an email that she finally had the correct documents from DC Open Doors and would email them shortly. This statement was false because

Defendant Monarch had been performing no work with DC Open Doors on behalf of Mr. Fraser. Consequently, Defendant Monarch never sent the documents from DC Open Doors because none existed.

86.    On September 19, 2014, Taylor emailed an inspection addendum and price reduction to Defendant Monarch, through Zabell, and the title company working on behalf of Mr. Fraser and stated: "Please order appraisal immediately and get title in place. Repairs have been completed." Defendant Monarch, through Zabell, replied, "Got It. Thanks."

87.    On Monday September 22, 2015, Mr. Fraser emailed Defendant Monarch, through Zabell, to double check that everything was in order for settlement, and inquired again about the DC Open Doors paperwork that she had for him to sign.

88.    Defendant Monarch, through Zabell, responded the morning of Friday, September 26, 2014, "Hey there! You will sign this at settlement…can I touch base with you tomorrow am?" However there was no attachment to this email.

89.    In addition, the title company emailed Defendant Monarch, through Zabell, that same day asking for her to advise on the title request. Defendant Monarch, through Zabell, responded that same day: "Hi! You will have shortly [sic]. We just got the approval back from dc open doors." However, no approval existed.

90.     Eventually, Mr. Fraser became frustrated and agitated with Zabell's lack of responsiveness.

91.     Taylor requested a copy of the appraisal and also the DC Open Doors documents from Defendant Monarch, through Zabell, via email the morning of September 26, 2014.

92.     Closing was at one time scheduled for Tuesday, September 30, 2014. When the title company emailed Defendant Monarch, through Zabell, Zabell responded that the closing "has now moved to Thursday." The closing had to be moved because Defendant Monarch, through Zabell, was attempting to conceal the fact that it had made the above misrepresentations and in fact had performed no work on Mr. Fraser's file.

93.     On Wednesday, October 1, 2014, Taylor requested that Defendant Monarch, through Zabell, make sure all necessary documents were in place for closing the next day.

94.     Defendant Monarch did not send any documents to Taylor, and closing was then backed up until October 6, 2014.

95.     On October 5, 2014, Taylor explained to Defendant Monarch, through Zabell, that he was concerned that the appraiser never saw the inside of Mr. Fraser's property. In fact, Defendant Monarch never appraised the property, but, through Zabell, falsely claimed that it had.

96.     On October 8, 2014, Defendant Monarch, through Zabell, emailed Taylor. Zabell wrote that she spoke with the seller and listing agent and stated

that they would be giving an extension to get the loan closed.

97.    Also on or about October 8, 2014, Taylor spoke with DC Open Doors, who informed Taylor that they did not even have a reservation for Mr. Fraser. At this point, Defendant Monarch's fraud was discovered.

98.    Defendant Monarch did not fund a loan for Mr. Fraser and he did not proceed to closing. Defendant Monarch never processed any loan documents or performed any work on Mr. Fraser's file despite making numerous knowing, intentional misrepresentations to the contrary.

99.    Defendant Monarch took adverse action against Mr. Fraser by not lending to him after receiving his credit application through Zabell. However, Defendant Monarch failed to provide Mr. Fraser with notice of this adverse action under 15 U.S.C. § 1691(d).

100.   In anticipation of closing and in reliance on the acts of Defendant Monarch, Mr. Fraser notified his existing apartment complex that he was moving out. Because closing did not occur on time, Mr. Fraser was forced to vacate his existing apartment. He was effectively homeless and had no place to live from September 26 to November 16, 2014. During this period, he stayed with a friend and paid for a storage unit to keep his belongings.

101.   Ultimately, Mr. Fraser was able to purchase 5033-5039 Sheriff Road NE through another lender, but only after experiencing temporary homelessness.

102.   As a result of Defendant Monarch's acts and practices, Mr. Fraser

suffered from stress, economic loss, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress.

### d.   Allegations with Respect to Mary and Franklin Waters.

103.   On or about August 18, 2014, Taylor referred Mary and Franklin Waters to Apex to work with Zabell.

104.   Apex, through Zabell, contacted Mr. and Mrs. Waters by email on August 19 and 21, 2014 to discuss mortgage lending.

105.   Apex, through Zabell, and Mrs. Waters discussed mortgage lending, and ultimately Zabell emailed Mrs. Waters a web link on August 22, 2014 so that she and Mr. Waters could apply for a mortgage loan through Apex.

106.   Sometime after August 24, 2014, Zabell was terminated by Apex for failing in her duties to take loan applications and process them through the pre approval and underwriting process. Apex did not notify Mr. or Mrs. Waters about Zabell's failures.

107.   Days later, Defendant Monarch hired Zabell. Mr. and Mrs. Waters then began to work with Defendant Monarch, through Zabell.

108.   On or about September 8, 2014, Taylor submitted an offer on behalf of Mr. and Mrs. Waters to purchase 520 N St. SW #S-510, Washington, DC 20024 for $202,500. The offer was eventually accepted and closing was scheduled for October 10, 2014. Mr. and Mrs. Waters also submitted an earnest money deposit of $2,500 with the offer.

109.   On September 8, 2014, Mrs. Waters received an email from Monarch

acknowledging that her loan application had been submitted.

110.   On September 10, 2014, Zabell emailed Mrs. Waters to discuss finishing Mr. and Mrs. Waters' loan application so that Zabell, on behalf of Monarch, could issue a pre approval letter as soon as possible. That same day, Mrs. Waters emailed Zabell the documentation needed to complete the loan application. However, Zabell had been performing no work towards pre-approving Mr. and Mrs. Waters.

111.   By September 10, Defendant Monarch, through Zabell, had all the application information necessary to provide Mr. and Mrs. Waters with their Good Faith Estimate and Truth in Lending Act Disclosures as required by 15 U.S.C. §§ 1638(a) & (b) and 12 C.F.R. § 1026.19(a). This required application information included the name(s), income, and social security number(s) of the borrowers, an estimate of the value of the property sought, and the mortgage amount sought. However, Defendant Monarch failed to provide Mr. and Mrs. Waters with these required disclosures.

112.   On or about September 10, 2014, Mr. and Mrs. Water's offer to purchase 520 N. St. SW #S-510 was accepted.

113.   On or about September 11, 2014, Zabell, on behalf of Monarch, emailed Taylor a pre-approval letter for Mr. and Mrs. Waters for $225,000. The conditions included "Receipt and Verification and submission of all information as required by automated underwriting systems or an underwriter, Federal or

State legal requirements and the requirements of Monarch Mortgage, Fannie Mae, Freddie Mac, FHA, VA, other applicable Federal, State or City Housing Agency, Authority, Department or the secondary market," "Receipt and verification of any additional information required to meet the conditions directly related to the product chosen by the borrower(s)," and "Receipt of an acceptable appraisal and required conditions by an approved appraiser as required by Monarch Mortgage, the guidelines of Fannie Mae, Freddie Mac, FHA, VA, or other applicable Federal, State or City Housing Agency, Authority, Department or the secondary market." In addition, the pre-approval letter stated that "All mortgage loans must have a complete credit package and appraisal submitted to underwriting prior to granting final loan approval."

114.   This pre approval letter was fake because Defendant Monarch had performed no work necessary to prequalify Mr. and Mrs. Waters.

115.   On September 12, 2014, Mr. and Mrs. Waters' contract to purchase 20 N. St. SW #S-510 was ratified.

116.   On September 17, 2014, Mrs. Waters paid $284 for a home inspection.

117.   On September 19, 2014, the seller's agent, Steve Gross, expressed his concern to Taylor because Defendant Monarch was not listed an an approved lender for the Harbour Square cooperative. Taylor subsequently emailed Defendant Monarch, through Zabell, that day, and Zabell, on behalf of Monarch,

indicated that she resolved the matter. However, Zabell had done no such work.

118.   On September 23, 2014, Mr. Gross expressed his concern that no lender approval had been provided to him or to Harbour Square for their approval and interview, which is required before settlement. Defendant Monarch, through Zabell, responded that same day, stating, "I left you a message this morning. We will have full commitment this afternoon." This representation was also false.

119.   On September 26, 2014, Taylor emailed Defendant Monarch, through Zabell, and stated that he still needed an approval letter from Monarch. Zabell responded that she should have the approval that day.

120.   The property that Mr. and Mrs. Waters sought to purchase was in a cooperative community. During the end of September and beginning of October, Mr. and Mrs. Waters took steps necessary to secure co-op insurance and have an interview with the community in reliance on the misrepresentations made by Defendant Monarch that they where able to provide financing for a co-op.

121.   On Wednesday October 1, 2014, Taylor requested that Defendant Monarch, through Zabell, provide an update on Mr. and Mrs. Waters' approval letter. Taylor noted that Zabell was supposed to provide this within 15 days of the contract date. Zabell replied, "Got it." However, Defendant Monarch continued to do nothing.

122.   On October 3, 2014, Taylor emailed Defendant Zabell requesting

that she send the mortgagee clause and insurance requirements "ASAP." He also noted that Defendant Monarch needed to send the documentation to the title company no later than Thursday, October 9, 2014. That same day, Defendant Monarch, through Zabell, said she would handle it and requested that Mrs. Waters send her insurance name and phone number, which Taylor subsequently did on Mrs. Waters' behalf. Again, Defendant Monarch did nothing.

123.   Zabell explained to both Taylor and the seller's agent, Steve Gross, that Defendant Monarch was acting as a broker for National Cooperative Bank (NCB). This statement was false. Defendant Monarch was performing no such task.

124.   Also on October 3, 2014, Defendant Monarch, through Zabell, told the seller's agent and the co-op that NCB would approve the loan by Monday, and that she was waiting on two "internal conditions." This statement was a complete fabrication.

125.   On October 4, Mrs. Waters requested a Good Faith Estimate and asked if she and her husband would need a bank certified check or personal check. No Good Faith Estimate was ever forthcoming.

126.   On October 5, 2014, Taylor explained to Defendant Monarch, through Zabell, that he was concerned that the appraiser never saw the inside of Ms. Water's property. In fact, Defendant Monarch misrepresented that an appraisal took place.

127.   On or about October 6, 2014, Defendant Monarch, through Zabell, sent Mr. and Mrs. Waters a "Closing Cost Worksheet." Her total monthly payment estimate was $994.77. This document did not take into consideration the seller's contribution of $5,000. The document was not a settlement sheet, but in fact was only a worksheet that did not reference any property. It also had transfer taxes on it. This document was a fake document created by Defendant Monarch through Zabell.

128.   On or about October 7, 2014, Defendant Monarch, through Zabell, sent Mr. and Mrs. Waters a "Mortgage Loan Approval" form for a 30 year fixed loan of $202,500 with a four percent interest rate. This approval was to expire on November 4, 2014, and included the following conditions: signed 2012 Amended Return, Proof of H06 Insurance, Final Verifications, and Final Compliance Review. This document was also a fake.

129.   Also on October 7, 2014, Zabell sent insurance requirements and additional information necessary to obtain unit owner's insurance to Mr. and Mrs. Waters' insurance company. Zabell stated to the insurance company that the premium was to be paid at closing which she knew was scheduled for October 10, 2014.

130.   On October 8, 2014, Taylor emailed Defendant Monarch, through Zabell to make her aware that he was waiting to hear back from the loan officer at National Cooperative Bank to confirm Mr. and Mrs. Waters' file was fully

approved and that the documentation would be delivered the next day.

131.    That same day, Taylor discovered that Defendant Monarch's fraud by discovering that they had done nothing to process Mr. and Mrs. Waters' loan with National Cooperative Bank. Defendant Monarch never processed any loan documents or performed any work on Mr. and Mrs. Waters' file despite making numerous knowing, intentional misrepresentations to the contrary.

132.    On October 9, 2014, Mr. and Mrs. Waters applied for a mortgage with PNC Bank.

133.    That same day, Mrs. Waters notified the cooperative that she would need to delay her move in date.

134.    On October 12, 2014, Dan FitzGerald, the division manager of Defendant Monarch, alerted the seller's agent and Taylor that Defendant Monarch does not offer co-op financing.

135.    That same day, Mr. FitzGerald also conceded that the "Closing Cost Worksheet" that Zabell sent on behalf of Monarch was not actually a settlement sheet. As Mr. FitzGerald noted "As you can see this is a work sheet and does not reference any property. It also has transfer taxes."

136.    Mr. FitzGerald also conceded that Monarch did not generate a loan package and process a loan as a broker for NCB.

137.    Defendant Monarch took adverse action against Mr. and Mrs. Waters lending to them after receiving her credit application through Zabell.

However, Defendant Monarch failed to provide Mr. and Mrs. Waters with notice of this adverse action under 15 U.S.C. § 1691(d).

138.   On October 17, 2014, Mr. and Mrs. Waters signed a release from Contract of Sale because they were unable to obtain a mortgage loan due to Defendant Monarch's acts and omissions. Mr. and Mrs. Waters had to forfeit their deposit to the seller.

139.   As a result of Defendant Monarch's acts and practices, Mr. and Mrs. Waters also suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress.

**e.      Allegations with Respect to Richard and Arnetta Wingfield.**

140.   Taylor referred Mr. and Mrs. Wingfield to Apex via Zabell on or about August 7, 2014.

141.   On August 11, Apex, through Zabell, spoke with Mr. Wingfield about applying for a mortgage loan.

142.   On or about August 13, 2014, Apex, through Zabell, pre-approved the Wingfields for a $232,031 loan and emailed a document called "wingfield pre app" to Taylor. The pre-approval was based on Plaintiffs' credit scores of 663, and noted that Apex also needed a ratified contract, proof of homeowner's insurance, clear title, and an acceptable appraisal in order to be finally approved. However, this document did not contain the property address or estimate of the

value of the property. In fact, Apex had not performed any work on the Wingfield's file and this pre approval letter was fake.

143.   The Wingfield's relied upon this fake pre-approval from Apex to make offers to purchase 17 Laughton Street, Upper Marlboro, Maryland 20774 and 4406 John St., Suitland, Maryland 20746. The sellers of these properties did not accept the Wingfield's offer.

144.   On August 14, 2014, Mr. Wingfield emailed Taylor noting that he still hadn't received the approval letter yet.

145.   Sometime after August 24, 2014, Zabell was terminated by Apex for failing in her duties to take loan applications and process them through the pre approval and underwriting process. Apex did not notify Mr. or Mrs. Wingfield about Zabell's failures.

146.   Shortly thereafter, Defendant Monarch hired Zabell. Mr. and Mrs. Wingfield then began to work with Defendant Monarch, through Zabell.

147.   On or about August 29, 2014, Defendant Monarch pre-approved the Wingfields through a letter sent by Zabell for a 30 year fixed rate VA loan for $242,755. The letter noted that "Credit scores are excellent and all income and asset documentation has been received and approved." Defendant Monarch conditionally approved the loan with the following conditions: ratified contract, clear title, proof of homeowner's insurance, and satisfactory appraisal.

148.   By August 29, 2014, Defendant Monarch, through Zabell, had all the

application information necessary to provide Mr. and Mrs. Wingfield with their Good Faith Estimate and Truth in Lending Act Disclosures as required by 15 U.S.C. §§ 1638(a) & (b) and 12 C.F.R. § 1026.19(a). This required application information included the name(s), income, and social security number(s) of the borrowers, an estimate of the value of the property sought, and the mortgage amount sought. However, Defendant Monarch failed to provide these required disclosures.

149.   That same day, Defendant Monarch through Zabell sent the Wingfields another pre-approval letter identical to the above letter, except that it was for a $230,000 loan. This document was also fake because Defendant Monarch had done nothing to "pre approve" the Wingfields.

150. The Wingfields relied on this document to make an offer on 7308 Berkshire Drive, Clinton, Maryland 20735.

151.   On or about September 2, 2014, Defendant Monarch, through Zabell emailed a file called "wingfield.doc" to Taylor. This document falsely implied that Defendant Monarch was working on the Wingfield's file.

152.   On or about September 16, 2014, Defendant Monarch, through Zabell emailed two files, "wingfield 242.doc" and "wingfield.doc" to Taylor. These documents also falsely implied that Defendant Monarch was working on the Wingfield's file.

153.   On September 17, 2014, Taylor requested that Defendant Monarch,

through Zabell, run the total monthly payment for the Wingfields. Defendant Monarch, through Zabell, responded that the monthly payment was already sent. Taylor noted that the Wingfields did not have this information, and Zabell agreed to resend it. However, Defendant Monarch never provided this information because it was not performing any work on behalf of the Wingfields.

154. On September 26, 2014, Taylor emailed Defendant Monarch, through Zabell, the Wingfield's ratified contract for 8103 Summitwood Court. Defendant Monarch, through Zabell responded that same day that she received the contract and said "Congrats." The contract was for the purchase of 8103 Summitwood Ct., Clinton, Maryland 20735 for a sale price of $242,755.00. The Wingfield's paid an earnest money deposit of $1,000.

155. Defendant Monarch never processed any loan documents or performed any work on Mr. and Mrs. Wingfield's file despite making numerous knowing, intentional misrepresentations to the contrary.

156. Defendant Monarch took adverse action against Mr. and Mrs. Waters by lending to them after receiving their credit application through Zabell. However, Defendant Monarch failed to provide Mr. and Mrs. Wingfield with notice of this adverse action under 15 U.S.C. § 1691(d).

157. In October, the Wingfields were subsequently pre-approved by Mortgage Link, Inc. for a 30 year fixed rate VA loan at 4 percent for $242,755.00, and later were able to close on a home.

158.  As a result of Defendant Monarch's acts and practices, the Wingfields suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment,  indignity, insult, nervousness, humiliation, and emotional distress.

## COUNT ONE
## TRUTH IN LENDING ACT (TILA)
## 15 U.S.C. § 1601, *et eq*.

159.  Plaintiffs re-allege and incorporate by reference the allegations set forth above.

160.  At all times relevant hereto, Defendant Monarch regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and is the person to whom the transaction which is the subject of this action is initially payable, making Defendant Monarch a creditor within the meaning of TILA, 15 U.S.C. § 1602(g) [§ 1602(f) prior to Dodd-Frank amendments] and Regulation Z § 1026.2(a)(17) [formerly § 226.2(a)(17)].

161.  Plaintiffs all applied for credit with Defendant Monarch, through Zabell, when Zabell brought her existing business to Defendant Monarch.

162.  Defendant Monarch had all the application information necessary to provide Plaintiffs with their Good Faith Estimate and Truth in Lending Act Disclosures as required by 15 U.S.C. §§ 1638(a) & (b) and 12 C.F.R. § 1026.19(a). This required application information included the name(s), income, and social

security number(s) of the borrowers, an estimate of the value of the property sought, and the mortgage amount sought. However, Defendant Monarch failed to provide these disclosures within three business days after receiving the application information.

163.   As a result of the acts and practices of Defendant Monarch, Plaintiffs were forced to delay or cancel the home buying process and suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress are entitled to actual damages, statutory damages, and attorneys fees pursuant to 15 U.S.C. § 1640.

WHEREFORE, Plaintiffs pray that this court:

a.   Enter judgment for Plaintiffs and against Defendant for actual damages in an amount in excess of $75,000.00;

b.   Award Plaintiffs statutory damages in the amount of $28,000;

c.   Award the Plaintiffs their attorneys fees and costs; and

d.   Grant such other relief as may be just and proper.

## COUNT TWO
## EQUAL CREDIT OPPORTUNITY ACT (ECOA)
## 15 U.S.C. § 1691, *et seq.*

164.   Plaintiffs re-allege and incorporate by reference the allegations set forth above.

165.   Plaintiffs are "applicants" within the meaning of 15 U.S.C. § 1691a(b) as they applied directly to Defendant Monarch for an extension, renewal, or continuation of credit, in this case loans to purchase homes.

166.   Such mortgage loans constitute credit within the meaning of 15 U.S.C. § 1691a(d) because, as a loan, it is the right granted by a creditor to purchase property and defer payment therefore.

167.   Defendant Monarch is a creditor within the meaning of 15 U.S.C. § 1691a(e) because it regularly extends, renews, or continues credit within the scope of its business as a mortgage lender.

168.   Plaintiffs all applied for credit with Defendant Monarch, through Zabell, when Zabell brought her existing business to Defendant Monarch.

169.   Pursuant to 15 U.S.C. § 1691(d), each applicant against whom adverse action is taken shall entitled to a statement of reasons for such action from the creditor.

170.   Defendant Monarch took adverse action against Plaintiffs by declining to extend credit to them after they applied for a home loan with Defendant.

171.   As a result of the acts and practices of Defendant Monarch, Plaintiffs were forced to delay or cancel the home buying process and suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress and are entitled to actual damages, punitive damages, and attorneys fees pursuant to 15 U.S.C. § 1691e.

WHEREFORE, Plaintiffs pray that this court:

a.   Enter judgment for Plaintiffs and against Defendant for actual damages in an amount in excess of $75,000.00;

b.     Award Plaintiffs punitive damages in the amount of $70,000;

c.     Award the Plaintiffs their attorneys fees and costs; and

d.     Grant such other relief as may be just and proper.

## COUNT THREE
## MARYLAND CONSUMER PROTECTION ACT (MCPA)
## Md. Code, Comm. L. § 13-101, *et seq.*

172.   Plaintiffs Mr. and Mrs. Armstrong, Mr. and Mrs. Waters, and Mr. and Mrs. Wingfield re-allege and incorporate by reference the allegations set forth above.

173.   Plaintiffs are consumers within the meaning of Md. Code, Comm. L. § 13-101(c)(1) because they are prospective purchasers of consumer realty and consumer credit.

174.   Pursuant to Md. Code, Comm. L. § 13-303(4), the MCPA prohibits unfair or deceptive trade practices in the extension of consumer credit.

175.   The MCPA, at Md. Code Ann., Comm. L. § 13-301, deems the following to be an unfair and deceptive trade practice in violation of the law:

a.     False, falsely, disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers. Md. Code Ann., Comm. L. § 13-301(1).

176.   Defendant Monarch violated these provisions through specific misrepresentations made to each Plaintiffs as set forth above including stating

that it was working on processing loan applications through the approval and underwriting process, when it was not, including falsified "preapproval," "closing cost worksheet," and "mortgage loan approval" documents and also claiming that appraisals occurred when they in fact had not Defendant Monarch did none of this work that it claimed to have done. In addition, Defendant Monarch made specific misrepresentations to each Plaintiff, including misrepresenting that it was getting approval for a septic repair for Plaintiffs Mr. and Mrs. Armstrong, and that it was acting as a broker for NCB with respect to Defendants Mr. and Mrs. Waters.

177.    As a result of the acts and practices of Defendant Monarch, Plaintiffs were forced to delay or cancel the home buying process and suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress and are entitled to damages and attorneys fees pursuant to MCPA § 13-408.

WHEREFORE, Plaintiffs Charles and Veronica Armstrong, Mary and Franklin Waters, and Richard and Arnetta Wingfield, pray that this court:

a.      Enter judgment for Plaintiffs and against Defendant for damages in an amount in excess of $75,000.00;

b.      Award the Plaintiffs their costs and reasonable attorney fees; and

c.      Grant such other relief as may be just and proper.

**COUNT FOUR**
**DISTRICT OF COLUMBIA CONSUMER PROTECTION ACT (DC CPA)**
**DC CODE § 28-3901, *et seq.***

178.   Plaintiff Sèkou Fraser re-alleges and incorporates by reference the allegations set forth above.

179.   Plaintiff is a consumer within the meaning of DC Code § 28-3901(a)(2) because he is the prospective purchaser of consumer credit to finance the purchase of a home.

180.   Defendant violated the DC CPA at DC Code § 28-3904, by engaging in the following:

        a.   misrepresent a material fact which has a tendency to mislead;

        b.   fail to state a material fact if such failure tends to mislead;

        c.   represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not;

181.   Defendant Monarch violated these provisions through specific misrepresentations made to Plaintiff as set forth above including stating that it was working on processing loan applications through the approval and underwriting process, when it was not, including falsified "preapproval," documents and also claiming that an appraisal occurred when it in fact had not. In addition, Defendant Monarch made specific misrepresentations to Mr. Fraser that it was obtaining payment assistance from DC Open Doors.

182.   As a result of the acts and practices of Defendant Monarch, Plaintiff was forced to delay the home buying process, became temporarily homeless, and

suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress and is entitled to actual damages, treble or statutory damages, punitive damages and attorneys fees pursuant to DC Code § 28-3905(k)(2).

WHEREFORE, Plaintiff Sèkou Fraser, prays that this court:

a.     Enter judgment for Plaintiff and against Defendant, jointly and severally, for damages in an amount in excess of $75,000.00;

b.     Award treble damages or statutory damages of $1,500 per violation, whichever is greater;

c.     Award the Plaintiff his costs and reasonable attorney fees; and

d.     Grant such other relief as may be just and proper.

## COUNT FIVE
## MARYLAND MORTGAGE FRAUD PROTECTION ACT (MMFPA)
## Md. Code, Real Prop. § 7-401, *et seq.*

183.   Plaintiffs Plaintiffs Charles and Veronica Armstrong, Mary and Franklin Waters, and Richard and Arnetta Wingfield re-allege and incorporate by reference the allegations set forth above.

184.   Pursuant to Md. Code, Real Prop. § 7-402, a person may not commit mortgage fraud.

185.   Pursuant to Md. Code, Real Prop. § 7-401, "mortgage fraud" means any action by a person made with the intent to defraud that involves:

a.     Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the

intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

b.      Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

186.   Defendant Monarch violated these provisions through specific misrepresentations made to each Plaintiff with the intent to defraud and induce reliance as set forth above including stating that it was working on processing loan applications through the approval and underwriting process, when it was not, including falsified "preapproval," "closing cost worksheet," and "mortgage loan approval" documents and also claiming that appraisals occurred when they in fact had not. In addition, Defendant Monarch made specific misrepresentations to each Plaintiff, including misrepresenting that it was getting approval for a septic repair for Plaintiffs Mr. and Mrs. Armstrong, and that it was acting as a broker for NCB with respect to Defendants Mr. and Mrs. Waters.

187.   As a result of the acts and practices of Defendant Monarch, Plaintiff was forced to delay or cancel the home buying process and suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress and are entitled to actual damages, treble damages, and attorneys fees pursuant to Md. Code Real Prop. §

7-406.

WHEREFORE, Plaintiffs Charles and Veronica Armstrong, Mary and Franklin Waters, and Richard and Arnetta Wingfield, pray that this court:

      a.     Enter judgment for Plaintiffs and against Defendant for damages in an amount in excess of $75,000.00;

      b.     Award Plaintiffs treble damages;

      c.     Award the Plaintiffs their costs and reasonable attorney fees; and

      d.     Grant such other relief as may be just and proper.

## COUNT SIX
## FRAUD AND DECEIT

188.  Plaintiffs re-allege and incorporate by reference the allegations set forth above.

189.  Defendant Monarch asserted numerous false representations of material facts to the Plaintiffs including stating that it was working on processing loan applications through the approval and underwriting process, when it was not, including falsified "preapproval," "closing cost worksheet," and "mortgage loan approval" documents and also claiming that appraisals occurred when they in fact had not. In addition, Defendant Monarch made specific misrepresentations to each Plaintiff, including misrepresenting that it was getting approval for a septic repair for Plaintiffs Mr. and Mrs. Armstrong, that it was obtaining payment assistance through DC Open Doors for Mr. Fraser, and that it

was acting as a broker for NCB with respect to Defendants Mr. and Mrs. Waters.

190.   Defendant Monarch knew that each of these representations were false, or made with such reckless disregard for the truth that the knowledge of the falsity of the statement can be imputed to Defendant Monarch. In fact, Defendant Monarch knew that it was doing nothing for the Plaintiffs.

191.   Defendant Monarch made each of these false representations for the purpose of defrauding the Plaintiffs.

192.   Each Plaintiff relied with justification upon the misrepresentations of Defendant Monarch throughout the mortgage lending process, including delayed closings.

193.   As a result of the acts and practices of Defendant Monarch, Plaintiffs were forced to delay or cancel the home buying process and suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress and are entitled to actual damages.

WHEREFORE, Plaintiffs pray that this court:

a.   Enter judgment for Plaintiffs and against Defendant for damages in an amount in excess of $75,000.00;

b.   Award punitive damages in an amount in excess of $75,000.00;

c.   Award the Plaintiffs their costs; and

d.   Grant such other relief as may be just and proper.

## COUNT SEVEN
## NEGLIGENT HIRING

194.   Plaintiffs re-allege and incorporate by reference the allegations set forth above.

195.   An employment relationship existed between Defendant Monarch and Zabell.

196.   As an agent and employee of Defendant Monarch, Zabell asserted numerous false representations of material facts to the Plaintiffs including stating that it was working on processing loan applications through the approval and underwriting process, when it was not, including falsified "preapproval," "closing cost worksheet," and "mortgage loan approval" documents and also claiming that appraisals occurred when they in fact had not Defendant Monarch did none of this work that it claimed to have done. In addition, Defendant Monarch made specific misrepresentations to each Plaintiff, including misrepresenting that it was getting approval for a septic repair for Plaintiffs Mr. and Mrs. Armstrong, that it was obtaining payment assistance through DC Open Doors for Mr. Fraser, and that it was acting as a broker for NCB with respect to Defendants Mr. and Mrs. Waters.

197.   As a result of these acts and practices Plaintiffs were forced to delay or cancel the home buying process and suffered from economic loss, stress, loss of sleep, inconvenience, embarrassment, indignity, insult, nervousness, humiliation, and emotional distress and are entitled to actual damages.

198.   Defendant Monarch knew or should have known by the exercise of diligence and reasonable care that Zabell was capable of inflicting harm of some type. In fact, days before Zabell was hired by Defendant Monarch, she was fired by Apex for making the same misrepresentations listed above.

199.   Defendant Monarch failed to use proper care in selecting, supervising or retaining Zabell. Defendant Monarch made no reasonable inquiry as to why Zabell was fired from Apex, and hired her days after she was fired by Apex for making the same misrepresentations listed above.

200.   Defendant Monarch's breach of duty likewise proximately caused Plaintiffs' injuries. Had Monarch not immediately hired Zabell, Zabell would not have been able to bring along her existing business from Apex and make the above misrepresentations to Plaintiffs.

WHEREFORE, Plaintiffs pray that this court:

a.   Enter judgment for Plaintiffs and against Defendant for damages in an amount in excess of $75,000.00;

b.   Award the Plaintiffs their costs; and

c.   Grant such other relief as may be just and proper.

### **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: August 26, 2015              Respectfully Submitted,


                                    */s/ E. David Hoskins*
                                    E. David Hoskins, Esq.
                                    Fed. Bar No. 06705
                                    THE LAW OFFICES OF E. DAVID HOSKINS, LLC
                                    16 East Lombard Street, Suite 400
                                    Baltimore, Maryland 21202
                                    (410) 662-6500 (Tel.)


                                    */s/ Max F. Brauer*
                                    Max F. Brauer, Esq.
                                    Fed. Bar No. 30162
                                    THE LAW OFFICES OF E. DAVID HOSKINS, LLC
                                    16 East Lombard Street, Suite 400
                                    Baltimore, Maryland 21202
                                    (410) 662-6500 (Tel.)